ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
SmythB@sec.gov
REBECCA LUBENS (Cal. Bar No. 240683)
LubensR@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>LEWIS I. WALLACH,<br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. From at least September 2015 through May 2020, Lewis I. Wallach, the former president of Professional Financial Investors, Inc. ("PFI"), a real estate investment and management company in Marin, California, misappropriated more than $26 million from investors as part of a larger fraudulent scheme, devised by PFI's now deceased founder, in which approximately $330 million was raised from more than 1,300 investors in PFI, Professional Investors Security Fund, Inc. ("PISF" and, together with PFI, "the Companies") and other related

entities. Many of the defrauded investors were elderly, retired and relying on their investment income for daily living expenses.

2. Wallach and the Companies' now deceased founder made false and misleading statements to solicit investors and sell securities issued by the Companies. Wallach and the founder falsely told investors that their money would be primarily used to invest in multi-unit residential and commercial real estate to be managed by PFI. Instead, a significant portion of investor funds was used in a Ponzi-like fashion to pay existing investors.

3. Wallach also falsely told investors that their investments were secure and liquid. For example, in response to investor concerns regarding the effects of the Covid-19 pandemic on PFI, Wallach falsely told investors that PFI was financially secure because it had large cash reserves, lines of credit and the ability to sell properties owned "free and clear." In fact, Wallach knew that PFI did not have large or even sufficient reserves to meet its obligations, had no lines of credit, and all properties had outstanding debt.

4. In addition, Wallach used investor money to personally enrich himself. Wallach used the more than $26 million in investor funds he misappropriated to, among other things, purchase a vacation home, luxury cars and coin collections, and to pay private school tuition.

5. The fraudulent scheme began to unravel shortly after the death of the Companies' founder on May 6, 2020, when a review of PFI's and PISF's financial records revealed questions about the short-term solvency of the entities as well as the historical operations of both Companies. Wallach has admitted to his role in operating the fraudulent scheme, including his misappropriation of investor funds.

6. Defendant Wallach has violated, and unless restrained and enjoined will continue to violate, the antifraud provisions of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77(q)(a)].

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9. Defendant Wallach, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendant Wallach met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

11. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Marin County.

## DEFENDANT

12. **Lewis Wallach**, age 64, resides in Encino, California. He began working at PFI in 1990 as a bookkeeper and was promoted to president in 1998. He served in that role until he was asked to resign by PFI in June 2020.

## RELATED ENTITIES

13. **Professional Financial Investors, Inc.** is a California corporation based in Novato, California that was founded in 1990. PFI is a real estate investment and management firm specializing in multi-unit residential and commercial real estate in Northern California. On

July 26, 2020, PFI filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of California.

14. **Professional Investors Security Fund, Inc.** is a California corporation based in Novato, California that was founded in 1983. PISF is a real estate investment and management firm that serves as limited partner for 10 real properties in Northern California. PFI is the general partner for each of the 10 real properties for which PISF serves as limited partner. On July 16, 2020, a group of PISF investors filed an involuntary Chapter 11 bankruptcy petition against PISF in Bankruptcy Court for the Northern District of California.

## FACTUAL ALLEGATIONS

### A. Background of PFI and PISF and the Securities Offered and Sold

15. PISF was founded in 1983 and PFI was founded in 1990. Both companies were founded as real estate investment and management firms specializing in multi-unit residential and commercial properties in Northern California.

16. In 1990, PFI hired Wallach as a bookkeeper. The Companies' founder served as the sole director, officer and shareholder of PFI until 1998, when Wallach took over as president of PFI. Wallach continued to serve as president of PFI until June 2020, when he was forced to resign because of his role in the fraudulent scheme.

17. Together PFI and PISF own a direct or indirect interest in approximately 70 residential and commercial real properties in California, including equity interests in limited liability companies (together, the "LLCs") that hold either fee title or an interest as tenant-in-common in various real properties and general partner interests in limited partnerships (together, the "LPs") that hold fee title to various real properties in California.

18. PISF is the majority limited partner of the 10 LPs, with the remaining interests in the LPs held by individual investors. PFI serves as the property manager for all of the properties in which it and PISF hold a direct or indirect interest. PFI is also the operational arm that manages the activities of itself and PISF.

19. Since at least September 2015 through May 2020, at the direction of the Companies' founder and Wallach, PFI and PISF raised funds from investors through the offer and sale of securities.

20. At the direction of the Companies' founder and Wallach, PFI and PISF offered and sold at least three different types of securities to investors:

   a) Promissory notes issued by PISF and secured by PISF's interests in the LPs (together, the "Straight Notes"). PISF Straight Notes carried an annual interest rate of 9% to 12%. The PISF Straight Notes were secured by PISF's units in the LPs. Investors could choose either a monthly cash payment or allow the interest to accrue.

   b) Promissory notes issued by PISF or PFI and secured by junior deeds of trust on real properties owned by the LPs or PFI (together, the "DOT Notes"). The DOT Notes carried an annual interest rate of 6% to 9%. They were secured by fractionalized interests in junior deeds of trust on specific properties owned by the PISF LPs or PFI. Investors received a monthly cash payment.

   c) Membership interests in various LLCs (together, the "LLC Members"). PFI offered LLC Members an equity membership interest in an LLC that purchased a specific property. PFI served as the general manager of the LLCs and held a 30% to 40% ownership stake in the LLCs. LLC Members received quarterly distributions that on average provided for an annual return of 6% to 9%.

21. Investors were told by the Companies' founder and Wallach that the interest payments and equity distributions for all of the securities offered and sold by PFI and PISF were to be made based on the income generated by PFI's management of the underlying real property, including collection of rents from tenants.

### B.   The Fraudulent Scheme

22. Since at least September 2015 through May 2020, PFI and PISF raised approximately $330 million from more than 1,300 investors through the offer and sale of the securities described above. A significant portion of those investors are elderly and invested IRA or other retirement funds. Many investors relied on investment returns to pay their daily living expenses.

23. Wallach and the Companies' founder were actively involved in the offer and sale of securities by PFI and PISF during that time. Wallach and the Companies' founder provided certain investors with investment documentation and made verbal representations regarding the securities to both new and existing investors.

24. Wallach and the Companies' founder also oversaw PFI's and PISF's finances. Wallach received frequent information from PFI's senior financial personnel regarding the financial condition of PFI, PISF and related entities. Wallach monitored the cash balances of the companies on a regular – often daily – basis. Wallach also controlled at least two of the bank accounts to which investors frequently wired funds.

25. While soliciting investments for PFI and PISF, Wallach made numerous false and misleading statements in both written and verbal communications to investors.

#### 1.   Wallach Made Misrepresentations to Investors Regarding the Use of Investor Funds

26. Wallach falsely told investors in each of the categories of securities offered by PFI and PISF that their monies would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF.

27. Investors in the Straight Notes and the DOT Notes did not typically receive a prospectus or other document describing the nature of the investment. Instead, Wallach made verbal representations to these investors that monies raised would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF.

28. Unlike investors in the Straight Notes and DOT Notes, LLC Members were provided an investment memorandum that provided certain disclosures regarding the investment (the "Investment Memorandum"). The Investment Memorandum stated that investor funds would be used to purchase, manage and sell a specific real property within a seven-year period and that cash proceeds from the sale would then be distributed to members.

29. Wallach directly provided the Investment Memorandum to a number of LLC Members. Wallach also made verbal representations to LLC Members that their investment funds would be used to purchase and manage real property.

30. The representations Wallach made to investors in the Straight Notes, DOT Notes and the LLC Members regarding the use of investor funds were false and misleading.

31. Contrary to Wallach's representations that investor funds would be used primarily to purchase and improve real property, Wallach knew that, in reality, a substantial portion of investor funds were used in a Ponzi-like fashion to pay back previous investors or to cover operating losses at PFI and PISF.

**2. PFI and PISF Used Investor Funds in Ponzi-Like Scheme**

32. Since at least September 2015 through May 2020, the real properties owned by PFI, PISF and related entities did not generate sufficient cash flow through rents and realized property appreciation to service the first mortgage bank loans on them or the securities issued to investors by the entities.

33. Between September 2015 and May 2020 – the period in which PFI and PISF raised approximately $330 million from investors – over $150 million was used in a Ponzi-like fashion to pay interest to prior investors, pay certain investors principal and cover the operating losses of PFI and PISF.

34. Wallach authorized monthly interest payments to Straight Note and DOT Note holders, and quarterly distributions to LLC Members that were routinely paid from new investor money.

35. When investor funds were raised by PFI and PISF, they were generally deposited into accounts associated with the entity for which the funds were purportedly raised. However, Wallach authorized investor funds to be effectively commingled and used to meet PISF's and PFI's obligations (including interest payments to prior investors) without regard for the entity for which the funds were purportedly raised.

36. Wallach had cash reports for PFI and PISF generated on a regular, often daily, basis to determine what cash existed across the various entities controlled by PFI to meet the companies' obligations. If cash was needed by a particular entity to meet its obligations (e.g., interest payments to investors), it would be "borrowed" from an entity with available cash. These transfers of funds were generally recorded as intra-company loans or "affiliate payables" owed by the entity to which the funds were transferred.

37. At the time Wallach represented to investors that their funds would be used primarily for the purchase and improvement of real property, he knew, or was reckless in not knowing, that his representations were false and misleading.

**3. Wallach Misappropriated More Than $26 Million in Investor Funds**

38. In addition to his role in operating the Ponzi-like scheme, Wallach misappropriated millions of dollars from investors within years of joining PFI until he was forced to resign in June 2020. Between September 2015 and April 2020, Wallach misappropriated more than $26 million in investor funds.

39. Wallach stole the more than $26 million directly from PFI and PISF bank accounts over which he had control. Wallach both wired funds from the PFI and PISF accounts directly to personal accounts within his control and directed payments from the PFI and PISF accounts to entities for Wallach's personal benefit.

40. Wallach directly wired over $3 million from PFI and PISF bank accounts to financial accounts controlled by him or his wife. In addition, Wallach used over $2.6 million in investor funds he misappropriated to pay his personal credit card charges, including for items such as extravagant vacations, luxury cars and private school tuition.

41. Wallach used more than $14 million of the investor funds he misappropriated to make a personal investment in a failed land development deal in Texas, and nearly $2 million to make a personal investment in a Texas oil and gas exploration venture.

42. Wallach used more than $1 million of investor funds he stole to purchase a beach house in Malibu, California. Wallach also used approximately $258,000 of investor funds to settle the outstanding balance he owed on an investment property he personally owned.

43. In addition to misappropriating cash, Wallach also added his or a family member's name in PISF's books and records as the owner of several Straight Notes and as a member for five different LLCs, despite having not contributed any capital to the relevant entities.

44. At the time Wallach misappropriated investor funds, he knew, or was reckless in not knowing, that he was not entitled to the funds and that his misappropriation of the funds was contrary to the representations he made to investors regarding the use of their funds.

### 4. Wallach Made Misrepresentations to Investors Regarding the Safety and Liquidity of the Securities

45. Between September 2015 and June 2020, Wallach misrepresented to investors the safety and liquidity of the securities offered and sold by PFI and PISF.

46. Wallach falsely told investors that funds invested in the Straight Notes and DOT Notes were liquid and could be cashed out at any time, with as little as a few days' notice. Wallach also falsely told LLC Members that they could withdraw their funds at any time, with just a couple weeks' notice. He also represented to investors that PFI and PISF maintained substantial reserve funds.

47. Contrary to Wallach's representations, Wallach knew, or was reckless in not knowing, that PFI and PISF lacked adequate cash to meet their obligations without bringing in new investor funds, let alone cash sufficient to provide liquidity to investors seeking to withdraw their investments on short notice.

48. Wallach also misrepresented to investors the safety of the investments by falsely telling investors that there was sufficient collateral backing the Straight Notes. In reality, the properties that he represented to be collateral were substantially encumbered by mortgages and deeds of trust, leaving PISF limited net equity to act as collateral for the securities offered and sold to investors.

49. At the time Wallach represented to investors that their investments were supported by sufficient collateral, Wallach knew, or was reckless in not knowing, that those representations were false.

**5. Wallach Made Misrepresentations to Investors Regarding the Financial Condition of PFI and PISF**

50. Over the course of 2019, PFI's and PISF's financial condition worsened. By late 2019, only a few of the properties managed by PFI had positive cash flow after taking into account their debt financing, and the vast majority could not cover expenses and interest.

51. To meet the financial obligations of the various PFI entities, PISF increasingly needed to issue more Straight Notes. In an effort to maintain investor funds, at the direction of the Companies' founder, Wallach also increasingly offered existing Straight Note investors the opportunity to "roll" their investments into LLC interests. This created more pressure for PISF to issue additional promissory notes to generate sufficient funds to cover PFI's expenses and make interest payments to existing note investors and LLC Members.

52. The financial condition of PFI and PISF deteriorated such that available cash across all PFI and PISF-affiliated entities declined from about $14 million at the beginning of 2019 to approximately $8 million by the end of the year. By March 2020, when the Covid-19 pandemic hit, cash levels declined even further, as incoming investor money slowed and investors began withdrawing their investments.

53. Despite the Companies' deteriorating financial condition, Wallach falsely told investors that PFI and PISF were in a financially strong position.

54. For example, Wallach sent an email to all investors on March 19, 2020 stating that "[t]he investments are doing exactly what they were meant to do" and noting that the companies had "[s]ufficient cash reserves." He added, "[w]e are not having any negative effects during this period." After sending the email, Wallach had it posted on PFI's website.

55. Wallach sent the email to investors and had it posted to PFI's website in an effort to calm investors concerned about the impact of Covid-19 on their investments and to aid in efforts to raise money from existing or new investors to keep the fraudulent scheme from collapsing.

56. PFI and PISF raised a total of approximately $23 million from investors in 2020 before the fraudulent scheme ultimately unraveled, including nearly $6 million after Wallach had his March 19 email posted to PFI's website.

57. After his email, Wallach continued to receive inquiries from investors concerned about the economic impact of Covid-19 on the companies, including tenants not paying rent and investor withdrawals. Wallach responded to these investors by falsely stating that PFI and PISF had large reserves, lines of credit, and the ability to sell properties owned "free and clear." Wallach made these representations despite knowing that PFI and PISF did not have sufficient reserves, had no lines of credit, and did not own any properties without debt.

### C. The Unraveling of the Fraudulent Scheme

58. On May 6, 2020, the Companies' founder died. After his death, a review of PFI's and PISF's financial records identified concerns regarding the historical operations of both companies.

59. Shortly after these concerns arose, Wallach confessed to both his role in operating the Ponzi-like scheme and his misappropriation of investor funds. In addition, he returned cash of $1 million and has taken steps to convey his vacation home and primary residence to the Companies.

60. PFI and PISF ceased raising investor funds in May 2020. In June 2020, Wallach was requested to, and did, resign from the companies.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

1. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 68.

2. By engaging in the conduct described above, Defendant Wallach, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a) Employed devices, schemes, or artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

3. By reason of the foregoing, Defendant Wallach violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

4. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 68.

5. By engaging in the conduct described above, Defendant Wallach, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

(1) with scienter, employed devices, schemes, or artifices to defraud;

(2) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

(3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

6. By reason of the foregoing, Defendant Wallach violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Defendant Wallach from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue an order requiring Defendant Wallach to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint, together with prejudgment interest thereon.

**III.**

Issue an order requiring Defendant Wallach to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Prohibit Defendant Wallach from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 29, 2020

Respectfully submitted,

*/s/ Bernard B. Smyth*
BERNARD B. SMYTH
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION